# THE SUPREME COURT

O F   T H E

## STATE OF ILLINOIS,

O F   C A S E S   A R G U E D   A T

### APRIL TERM, 1860, AT OTTAWA.

---

JOHN B. SMITH *et al.*, Plaintiffs in Error, *v.* THE PEOPLE Defendants in Error.

ERROR TO RECORDER'S COURT OF CHICAGO.

A conspiracy to seduce a female is punishable by indictment and conviction, whether the means resorted to be unlawful or criminal, or not.

Criminal offenses, not enumerated in our code, may be tried as at common law.

It is an indictable offense to conspire to do an unlawful act, by any means; or to conspire to do any act, by unlawful means.

THIS indictment, filed at the April term, A. D. 1860, of the Recorder's Court, of the city of Chicago, contains two counts for conspiracy.

The first count charges, that Charles H. Schwab, John B. Smith and Mary C. Allen, on the first day of March, A. D. 1860, at Chicago, did, between themselves, unlawfully conspire, combine, confederate and agree together, wickedly, knowingly and designedly, to procure by false pretenses, false representations and other fraudulent means, one Lizzie M. Engles to have illicit carnal connection with a man, to wit, with the said Charles H. Schwab, one of the defendants aforesaid.

The second count charges, that the defendants did, then and there, (on the same day) unlawfully between themselves, combine, confederate and agree together wickedly, knowingly and designedly, to cause and procure, by false pretenses, false representations, and other fraudulent means, one Lizzie M. Engles, then and there a minor female child, of the age of sixteen, to

2

have illicit carnal connection with a man, to wit, with the afore-
said Charles H. Schwab.

To this indictment the plaintiffs in error pleaded not guilty,
in proper person.

On the trial, the said *Lizzie M. Engles,* who was the only
witness for the prosecution, testified substantially as follows:

I reside at No. 325, Chicago Avenue.  I am fifteen years old
the 18th July last; I have been in the city about three years,
but have not lived here all the time; have been at Rockford and
Kenosha at school; I see Mr. Schwab, and Mr. Smith, and Mrs.
Allen (referring to persons in court) that I know; I was going
on an errand for my mother, about ten weeks ago, and met Mrs.
Allen's daughter; she said her mother was sick, and she wanted
me to go in and see her; I said I had not time, but would call
some other time; then her mother came to the door and asked
me to come in and write a letter for her; I said I had not time
then; she then asked me to come the next Monday; I said I
would if I got time; I went in then, and she asked me to write
the letter; said she would sit by the side of me and tell me
what to write; this was the next Monday; I wrote the letter.

After that, she said she was going on South Water street to
collect a bill at a wholesale liquor store, and did not like to go
alone; I said I did not like to go; she said she did not like to
go alone.  Then she took down her black silk dress and asked
me if I would put that on and go with her.  I asked her why I
should·put that on?  She said if I put that on, I would go in
with her, and if I put my own on I would not go in with her.
I put it on over my dress; she said I would not see any one but
an old gentleman.  I thought it would be no harm.  She went to
J. B. Smith & Co.'s, South Water street; she took a decanter
along from the house.  I went to the store door, and she said,
come in; I went in the office; Schwab was reading a book, and
Smith was reading a newspaper by the desk; Schwab gave me
a chair, and I sat down.  Schwab came to me and said, will you
allow me to raise your veil?  I said I did not like to.  Then
he came to me the second time and said, I will take it off; I
said it was not being very polite for a stranger to act in that
way.  I got up to go out of the office, and he got up and turned
a catch over the door, and told me to go and take my seat; I
went and took my seat.  Mrs. Allen looked at Schwab and
winked at him; she asked him if he would get a couple of
glasses of wine.  He got two tumblers; was gone about five
minutes; came back and gave one tumbler to me and one to
Mrs. Allen.  After handing the wine to me, I said I could not
drink it all; my glass was lighter colored than hers.  Mrs.
Allen said I might look at hers.  I told Schwab I could not

drink it; I spilt some, and Smith said that ladies that called there did not treat them as I did; did not waste their wine. I wasted part of it, and drank the rest.

Mrs. Allen said there was a piano up stairs. Before that, Schwab went to the desk and took out a $10 gold piece, wrote a note, and said if she would take that and go and get his ring of a lady he was offended with, he would give her the gold piece. She then said there was a piano up stairs she was going to buy for her daughter. Schwab said he would go up and show it to me; Smith said he would go. Schwab did not want Smith to go. Schwab asked me if I did not want to go and see it. I said I had seen a great many, and did not care about going. She asked me if I could not play, and said she wanted me to see it before she bought it. Mr. Schwab and Mrs. Allen went up stairs with me, and there was an old one there and a bureau, and a bedstead with a tick on it—a lounge, lamp and chairs in it—some shades up by the window. Mrs. Allen said she must go down stairs and stay with Smith, and wanted me to stay till she came back. I tried to open the door, but could not. I then went to the window, and he pulled down the curtains or shades. I asked him why he did that. He said he did not want the men from the other side the street looking in there. I tried to open the door, and he asked me to come and sit on the lounge with him. He took hold of me, and I went and sat on the lounge with him. He said, this is Mrs. Allen's dress, he was well acquainted with it. He asked me if I would stay with him a little while; he said if I would, he would buy me a nice silk dress, as nice as Chicago could afford. I said I did not want his silk dress; if I wanted one, my mother would get one. He asked me if I heard him tell Mrs. Allen to get a ring. I said, yes. He said it was a diamond ring, and he would give that to me. I asked him if he could tell me the time. He took out his watch, and said it was half past twelve. I told him it was later than that when we called at the office. He said he had just come from New York, and had New York time. He asked me if I did not want the little watch and chain. I said, no; I said I must go home, I had to be at school at half past one. He said I had plenty of time, and would not let me out of the room. He showed me a ring on his finger, and asked me if I wanted that. I told him I did not want any of his presents.

I pulled up one of the shades, and he pulled it down. Then I started for the door; he came to the door, and I could not get out. Then I said, if my brother was in your place, and your sister should call here, and he should treat her as you treat me, what would you say? He said he had sisters, and they were highly respectable, and his sisters did such things, and all

girls would do so, and it would not be known. I went to the door and got it open, and he pushed me back and took me to a chair, and pulled me on his lap and said, you are a nice looking little girl, can't you afford to give me a kiss? I said I could not. Then he tried to put his hands under my clothes. I said he had better look out how he was acting around me.

Mrs. Allen came up, and asked if he had committed his purpose. He said, no, she pretends to be too much of a lady. She pulled me off his lap and pushed me against the bedstead, and told me to stay there till she got back; she was going out of the room to fix her skirts; told me to stay till she came back; she was gone but a minute or two, or two or three minutes. Schwab said the wine was too strong for me—shall I not give you another glass? When she pushed the door open, Schwab said, if you will meet me at the house of Mrs. Allen to-morrow, I will let you go; if not, I must stay there with him. I said I would, but did not go.

After we started to leave, Mrs. Allen wanted me to go further up stairs, to see where they cultivate liquor. We started to go up and a man came up, and Schwab pulled me back; he said he did not want the man to see me. I said, I am not afraid of the man. He pushed me out of sight of the man. We went up stairs; there was a stove and some pipes connected with it. Schwab said, there was where they cultivated liquor. Then I went down. Mrs. Allen said, as we were going down, Smith is damned mad I did not let him go up with you.

After we got down, Schwab took up a couple bottles of champagne and asked his porter, in German, if Smith had taken a couple of bottles of champagne to his dinner. He said, yes.

When I met the parties, it was in the city of Chicago, between La Salle and Wells streets.

She had never seen Smith and Schwab before she was at their store.

The defendants, Smith and Schwab, then called some ten or twelve witnesses, who testified that they were acquainted with their general character, and that it was good. And the court then gave the following instructions for the People:

1. The jury, in determining whether the defendants, or any two of them, did act in concert to cause the said Lizzie M. Engles to have illicit intercourse with said Charles H. Schwab, should take into their consideration all the facts and circumstances' detailed in evidence by the witness, Lizzie M. Engles; the conduct of said Schwab and Smith immediately after the girl, Lizzie M. Engles, and the defendant Allen came into the store, as detailed in evidence; the fastening of the door, if the jury believe, from the evidence, the door was fas-

tened ; the statement of defendant Allen about the piano, if the jury believe, from the evidence, that defendant Allen made statements about the piano ; the procuring of wine, if the jury believe, from the evidence, that wine was procured ; the offer of a silk dress and ring to Lizzie M. Engles, if the jury believe, from the evidence, that such offers were made ; in fact, all the acts of the defendants, as shown by the evidence.

2. It is not necessary for the People to prove that there was any concert of action between the defendants, before the said Lizzie M. Engles was introduced into the store of the defendants, Schwab & Smith, by the defendant, Mary C. Allen, if the jury believe that said Lizzie M. Engles was introduced into the store of the defendants, Schwab & Smith.

3. But it will be sufficient if the People have proved to the satisfaction of the jury that any two of the defendants acted in concert, and with an understanding and to the end that the defendant, Charles H. Schwab, should have illicit carnal connection with the said Lizzie M. Engles, after she was so introduced into the store by the said Mary C. Allen, if she was so introduced.

4. The soliciting of a female to have illicit carnal connection with a male person, by two or more persons, constitutes an indictable conspiracy.

5. A conspiracy is a combination of two or more persons, by some concert of action, to accomplish some criminal or unlawful purpose, or some purpose, not in itself criminal, by criminal or unlawful means.

6. The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design, and to pursue it by common means.

7. If it is proved that the defendants pursued, by their acts, the same object, often by the same means, one performing one part, and another, another part of the same, so as to complete it, with a view of the attainment of that same object, the jury will be justified in the conclusion that the defendants were engaged in a conspiracy to effect that object.

And the defendants then asked the court to give the following instructions :

1. To convict under an indictment for conspiracy, either the end attempted to be accomplished must be unlawful, or the means used must be unlawful, and under such circumstances the word " unlawful " means, partaking of criminality.

2. The defendants are presumed to be innocent, and the jury cannot convict them unless they are proved to be guilty beyond a reasonable doubt.

3. Before the jury can convict the defendants, or either of them, they must be satisfied, from the evidence, that two or more of the defendants had agreed or combined by unlawful means to accomplish the act alleged in the indictment. There can be no conspiracy without an agreement, or combination, and the means to be used must be unlawful and criminal.

4. Unless the People have expressly proved the fact, or such circumstances as render it reasonably certain that before the prosecutrix went to the store of the defendants, Smith & Schwab, there had been a previous concert and agreement between them and Mrs. Allen, the other defendant, to bring the prosecutrix there for the purpose alleged in the indictment, they will acquit the defendants under this indictment.

5. It is not enough that the defendants, or either of them, endeavored to induce the prosecutrix to let either of them have connection with her. There must have been an agreement or combination to accomplish the act by unlawful and criminal means.

6. To warrant the jury in convicting the defendants of conspiracy, by false representations in this case, they must have been of such a character as were calculated to deceive the prosecutrix, and against which she could not, by reasonable and ordinary prudence, guard ; and such as were calculated to accomplish the act alluded to in the indictment.

7. It is not enough that the defendants, or either of them, endeavored to induce the prosecutrix to let them, or either of them, have connection with her. There must have been an agreement or combination to accomplish the act by unlawful means—meaning " criminal means."

8. Unless it shall be expressly proven that a conspiracy existed, as alleged in the indictment, and that Smith knew that the object of Mrs. Allen and Schwab was to have sexual intercourse with the prosecutrix, when they visited the upper room, and that he also aided and assisted them by criminal means in the same, they will acquit him.

And the court gave the first two of said instructions asked for by defendants, but refused to give the others, and to such refusal said defendants excepted.

And thereupon the jury returned with a verdict of guilty as to all of the defendants.

And the defendants, Smith & Schwab, moved in arrest of judgment, which motion was overruled.

The recorder then proceeded to sentence defendants, Smith & Schwab, each to the City Bridewell, for the term of six months, or to pay a fine of $100, and one-third costs of prosecution, and the defendant Allen to be imprisoned in the City Bridewell three months.

The errors assigned were that—

There is no indictable offense set forth in the indictment.

The court erred in refusing to arrest the judgment.

The court erred in refusing to grant a new trial, upon the ground that the verdict was against the evidence.

In refusing to grant a new trial as to Smith, upon the ground that there was no evidence upon which to convict him.

The court erred in giving the second instruction on the part of the State.

In giving the fourth and fifth instructions on the part of the People.

The court erred in refusing to give the 3rd, 4th, 5th, 6th, 7th and 8th instructions requested on the part of the defendants.

In allowing evidence to be given of the declarations of Mrs. Allen, in reference to Smith, without evidence connecting him with a prior conspiracy.

WOODWARD, LULL & ABBOTT, and E. VAN BUREN, for Defendants in Error.

C. HAVEN, District Attorney for the People.

CATON, C. J. To attempt to define the limit or extent of the law of conspiracy, as deducible from the English decisions, would be a difficult if not an impracticable task, and we shall not attempt it at the present time. We may safely assume that it is indictable to conspire to do an unlawful act by any means, and also that it is indictable to conspire to do any act by unlawful means. In the former case it is not necessary to set out the means used, while in the latter it is, as they must be shown to be unlawful. But the great uncertainty, if we may be allowed the expression, is as to what constitutes an unlawful end, to conspire to accomplish which, is indictable without regard to the means to be used in its accomplishment. And again, what means are unlawful to accomplish a purpose not in itself unlawful. As this indictment falls under the first class, we shall confine ourselves to that. If the term unlawful means criminal, or an offense against the criminal law, and as such punishable, then the objection taken to this indictment is good, for seduction by our law is not indictable and punishable as a crime. But by the common law governing conspiracies the term is not so limited,

and numerous cases are to be found where convictions have been sustained for conspiracy to do unlawful acts, although those acts are not punishable as crimes. Nor yet would it be quite safe to say that the term unlawful as here used includes every act which violates the legal rights of another, giving that other a right of action for a civil remedy. And we are not now prepared to say where the line can be safely drawn. It is sufficient for the present case, to say that conspiracies to accomplish purposes which are not by law punishable as crimes, but which are unlawful as violative of the rights of individuals, and for which the civil law will afford a remedy to the injured party, and will at the same time and by the same process punish the offender for the wrong and outrage done to society, by giving exemplary damages, beyond the damages actually proved, have in numerous instances been sustained as common law offenses. The law does not punish criminally every unlawful act, although it may be a grievous offense to society. And in determining what sort of conspiracies may or may not be entered into without committing an offense punishable by the common law, regard must be had to the influence which the act if done, would actually have upon society, without confining the inquiry to the question whether the act might itself subject the offender to criminal punishment. And most prominent among the acts branded as unlawful, although not punishable as crimes, is the very act, to accomplish which, this conspiracy is charged to have been entered into. It is more destructive of the happiness of individuals and of the well-being of society, than very many others which are punishable as crimes, and the law has ever favored its punishment by exemplary damages to the parent, guardian or master of the victim of seduction, although he is often regarded as the injured party by the merest technicality. To say that it is innocent, or not a crime, for parties to band and conspire together to accomplish the destruction by seduction, of any young girl in the community, unless it can be shown that the means to be used are unlawful, and then hold that such unlawful means must of themselves be criminal and punishable as such, would be giving a legal sanction and encouragement to such conspiracies. Under such decisions the courts, instead of being the guardians of the peace and happiness and well-being of society, would lend their sanction to its worst enemies. If there be any act which should be regarded as unlawful in the sense of the law of conspiracy, but which is not punishable as a crime, it is this very act, and so it has been and ever should be regarded by the courts. We do not hesitate to hold, that a conspiracy to accomplish such an object as this, whether the means to be used be unlawful or criminal or not, is a crime at the common law, and that it is the

duty of the courts to protect society against such conspiracies by their punishment. If the laws of the land will not afford such protection, then individuals will protect themselves by violence, for it is not in human nature to let such offenses go unpunished in some way. Counsel say, in argument, that if we sustain this conviction no man in community can repose in security. We answer, no man who will enter into a conspiracy to accomplish so nefarious a purpose as this, should be allowed to repose in security; and if parties who thus offend are allowed to do so, then innocent and useful members of society cannot. We hold that it was not necessary to show that the means to be used by the conspirators were unlawful or criminal.

The objection that this being but a common law offense, is not punishable in this State, where we have a criminal code defining most criminal offenses and prescribing their punishment, is answered by the case of *Johnson* v. *The People*, 22 Ill. 314. It is there shown, that our criminal code prescribes punishment for offenses not enumerated, which can mean nothing but common law offenses, showing conclusively that it was not the intention of the legislature to repeal that portion of the common law by implication.

We do not deem it necessary to review the instructions in detail. We have examined them and the questions made upon them, and find no error committed by the court in the instructions; nor do we think that the verdict was unsustained by the proof. The judgment is affirmed.

*Judgment affirmed.*

BREESE, J., dissents.