People of the State of Illinois, Defendant in Error, v. Clement Amore et al., Plaintiffs in Error.

Gen. No. 39,686.

Opinion filed February 2, 1938.

Thomas Marshall, of Chicago, for plaintiffs in error.

Thomas J. Courtney, State's Attorney, for defendant in error; Edward E. Wilson, John T. Gallagher, Melvin S. Rembe and Blair L. Varnes, Assistant State's Attorneys, of counsel.

Mr. Justice Hall delivered the opinion of the court.

Defendants, Edna Sulli, Dorothy Berger and Rose Amore, as judges, and Nancy Delmonico and Kate Paldo, as clerks, of a primary election held in the 4th precinct of the 20th ward in the city of Chicago on April 14, 1936, together with Barney Siegel, John Zittello and Sanders Caravello, as watchers, were found guilty of a charge of conspiracy to violate the election laws in a trial in the criminal court of Cook county before a jury. After a written motion for a new trial had been entered and overruled, Clement Amore, Barney Siegel, John Zittello, Sanders Caravello and Dorothy Berger, were each sentenced to serve a term in the Illinois penitentiary of not less than one year and not more than five years, and Edna Sulli, Rose Amore and Nancy Delmonico were each ordered to pay a fine of $200. The written motion for a new trial filed in the cause, is as follows:

"Now come the defendants above named and move the Court to grant a new trial in the above entitled cause for the reason that the above defendants were convicted without proof beyond every reasonable doubt. That said conviction was the result of prejudice on the part of the jury impanelled herein.

"These defendants further show unto your Honor as a reason for a new trial that the indictment in this case concludes 'Contrary to Law' rather than 'Contrary to Statute.'

"These defendants further represent unto your Honor that the jury were also prejudiced by reason of the inflammatory remarks of the Assistant State's Attorney who tried the cause herein.

"As a further reason for a new trial, these defendants represent unto your Honor that the jury in this cause were carried away and inflamed by a passion and prejudice, a further discussion of which will be presented to the Court upon the oral hearing on this Motion."

In *People v. Hatcher,* 334 Ill. 526, we find the following:

"Complaint is made of the first, thirteenth and fourteenth instructions on behalf of the People. No question was raised in the trial court as to the first and thirteenth instructions. Defendants filed a written motion for a new trial and a written motion in arrest of judgment, in both of which they complained that the court was in error in giving the fourteenth instruction but no error was assigned as to any other instruction. Under the practice in this State, decisions of the court made in the progress of the trial upon instructions, objections to evidence, or other matters of law arising in the cause which have been incorporated in a bill of exceptions, may be assigned for error and reviewed by an appellate court without any motion for a new trial. *They are not waived by making a motion for a new trial if such motion is submitted without any points stated in writing, but after a motion is made for a new trial and the grounds thereof are stated in writing the party is limited to the errors alleged in the written motion and all other errors are deemed to have been waived.* (*Chicago City Railway Co. v. Smith,* 226 Ill. 178; *Yarber v. Chicago and Alton Railway Co.,* 235 id. 589; *People v. O'Gara,* 271 id. 138; *People v. Cione,* 293 id. 321; *People v. Perlmutter,* 306 id. 495; *People v. Vickers,* 326 id. 290; *People v. Gabrys,* 329 id. 101.)" (Italics ours.)

The Practice Act (Ill. Rev. Stat. 1937, ch. 110, § 192; Jones Ill. Stats. Ann. 104.068) among other things, provides that "If either party may wish for a new trial . . . he shall before final judgment . . . within such time as the court may allow . . . by himself or

counsel, file the points in writing, specifying the grounds in such motion. . . .''

The evident purpose of this act, and the reason for the holding of the Supreme Court in the various cases cited, in our opinion, is that the trial court be given an opportunity to correct its own errors, and that if such opportunity is not given, then and in that case, no errors, other than those noted in the written motion, may be urged in a court of appeal.

One of the points raised by the defendants in the motion for a new trial is that ''the indictment in this case concluded contrary to law rather than contrary to statute.'' It will be noted that no other or further objection was made to the indictment.

In *People v. Curran,* 286 Ill. 302, a number of persons were found guilty of the crime of conspiracy. They were all members of certain labor unions—the Painters' District Council, the Glaziers' Union, the Wood Finishers' Union and the Fixture Hangers' Union. The alleged scheme was to extort money from owners of property desiring to have painting or glazing done, in order to have their properties taken off of a black list. Objection was made to the indictment, which charged an offense under the Criminal Code, that it should have concluded against the form of the statute instead of, as here, contrary to law, and the Supreme Court said:

''If an act is an offense both against the common law and the statute, the prosecutor may proceed under either the statute or the common law or both. (*Chicago, Wilmington and Vermilion Coal Co. v. People,* 214 Ill. 421.) It was not necessary, to constitute the offense of conspiracy at common law, that the object of the conspiracy should constitute a criminal act, but it was sufficient if the object was unlawful though not indictable. (*Smith v. People,* 25 Ill. 17.)'' (See also *People v. Maloney,* 132 Ill. App. 184.)

In *Smith v. People,* 25 Ill. 17, the Supreme Court said:

"To attempt to define the limit or extent of the law of conspiracy, as deducible from the English decisions, would be a difficult if not an impracticable task, and we shall not attempt it at the present time. We may safely assume that it is indictable to conspire to do an unlawful act by any means. . . ."

Counsel do not contend that the indictment did not sufficiently charge a conspiracy to do an unlawful act, but, as stated, object to the fact that it concludes "contrary to law" instead of "contrary to statute." We think the objection is hypercritical, and is without merit.

In the written motion for a new trial, the misconduct of counsel for the State, and the prejudice of the jury, are noted, but as these errors are not suggested here, they will be disregarded. Many other errors are suggested here, based upon instructions and matters incorporated in the certificate of evidence, but as they were not mentioned in the written motion for a new trial, they also will be disregarded.

It is insisted by counsel for defendants that "there is no credible evidence of guilt of defendants." Most of defendants' contentions as to the last mentioned proposition are predicated upon testimony adduced in another case, No. 39710 in this court, which is an appeal from a judgment of the county court, wherein defendants were found guilty of contempt of court. Of course, none of the evidence adduced in that case was before the jury in the instant case, and cannot be considered here.

R. E. Haythorne, a witness for the State in the trial in the criminal court in the instant case, testified to the effect that he was a watcher at the election in question; that he arrived at the polling place at about 5:30 in the morning and that he left at about 1:45 the fol-

lowing morning; that he saw all the defendants there during the time the election was being held; that Dorothy Berger took charge of one of the registers and Edna Sulli took charge of the other; that the witness observed voters asking for instructions; that when the first of these voters asking for instructions, took a democratic ballot, Dorothy Berger took the ballot, went into the booth, marked it, brought it back, gave it back to the person who was voting, and that this person put it in the ballot box, and that he saw Dorothy Berger do this thing about 70 times during the day; that on most of these occasions, no other member of the board went into the booth with her. He also stated that on a number of other occasions, he could not remember whether the voter went into the booth with Dorothy Berger or not, but that on many occasions, she picked up the ballot, went into the booth, marked the ballot, brought it out and gave it to the voter, who deposited it in the box, as stated; that he saw Rose Amore go into the voting booth with other voters about 70 times; that he saw John Zittello at the polling place, and that about midafternoon of election day, he, Henry L. Hill, a witness hereinafter mentioned, and Zittello had a conversation; that Zittello told the witness and Hill that he, Zittello, would like to put some votes through, and asked the witness if he, Zittello, would be allowed to do so, and that Zittello said, ''We will make this worth your while if you will allow us to do it.'' This witness further testified to the effect that when the polls closed at 5 o'clock in the afternoon, he looked at the poll books and observed that the last name written on the books at that time was that of Mary Sasso, opposite line 473; that later in the evening, he saw the poll books and that there were other names added, and that the last number on the poll book at that time was 511; that after the polls were closed and the counting had begun, Dorothy Ber-

ger called off the names of the candidates to the clerks for about an hour, and that during the rest of the evening, John Zittello and Clement Amore called them off; that Clement Amore handled the ballots, and that he would look at the ballot and call off the name, but "not all the names on the ballot"; that during the evening Caravello said: "Why doesn't my candidate Vacco get more votes?" Barney Siegel answered him, stating, "Pipe down, we have our orders." On further examination, this witness stated that he was a student at the University of Chicago; that a man named McQueeny came out to the University and gave him his credentials as a watcher, and that McQueeny delivered a lecture on the proper procedure to be carried on by boards of election; that he was hired by McQueeny and received $10 for his services, to be paid by McQueeny; that he made pencil notes of matters that occurred during the election; that Dorothy Berger was the democratic judge; that he saw Clement Amore vote more than once, and distinctly remembered the first and second time he voted; that 140 persons voted by instruction given to the voters by either Dorothy Berger or Rose Amore, and that only 81 affidavits of illiterate voters were made out.

Henry Hill, a witness for the State and a watcher at the election in question, testified to the effect that he arrived at the polling place about 6 o'clock in the morning, and that the people officiating at the polls at that time were Dorothy Berger, Edna Sulli, Kate Paldo, Nancy Del Monico and Rose Amore; that Edna Sulli handled the register and that Rose Amore wrote the names in the poll books; that Kate Paldo handled one register and also wrote in the poll books; that voters asked for and received instructions; that when a democratic voter asked for assistance, Dorothy Berger rendered assistance by going into the booth alone with the voter, and that no other board member went

with her, and that when a republican voter asked for assistance, Rose Amore went into the booth with such voter, and that no other judge or clerk went with her; that Dorothy Berger rendered assistance to 40 or 50 voters, and that Rose Amore rendered assistance to about the same number; that he saw Clement Amore vote early in the morning, and that he saw him vote again later in the day. This witness identified John Zittello and testified that he had a conversation with him at the polling place about 3 o'clock in the afternoon, at which Mr. Haythorne was present; that Zittello told them that he, Zittello, had a certain number of votes to get through, that it was getting late, and that he wanted to know if he could rush a few through in a hurry, that the board was afraid to do anything because of the presence of the witness and Haythorne, and that if he, the witness, and Haythorne would permit him to do so, it would mean a few dollars to them, and that when they refused to accede to the request, Zittello turned to them and said: ''Well, let us let the whole thing drop.'' Both Haythorne and this witness testified that Zittello and Clement Amore took part in handling, counting and tallying the ballots, and that a man named Sulli, husband of one of the judges, together with Barney Siegel, handled other ballots, and that he saw Sanders Caravello sitting next to Sulli, marking X's in the sections opposite the name of Carmen Vacco.

Twenty-three witnesses, whose names appear on the poll books as having voted at this election, testified that although they were registered voters, they did not vote at the election in question. Several witnesses, voters, testified that they asked for a ballot, received it, and asked for instructions, and that but one judge went into the booth with them. A handwriting expert testified that since the election, he had examined approximately 500 ballots; that he observed one democratic ballot which bore a number of crosses marked

by a red pencil, and that he also found on this same ballot, a cross marked before the name of Carmen Vacco, made by a black graphite pencil. He also testified that a number of ballots had crosses before the name of Vacco, which were made by a different person than the one who made other crosses on the ballot. He testified that a great number of ballots were each marked by two persons.

The record indicates that the ballots in question, poll books, tally sheets and other documents referred to, were, by agreement, introduced and received in evidence. They are not in the record filed here.

Both Dorothy Berger and Rose Amore testified that they only gave instructions to a voter when requested so to do, and that on each of such occasions, one of them went into the booth with the voter. They each denied that either of them marked the ballot, each insisting that the ballot was marked by the voter. None of the defendants attempted to explain why affidavits were not requested by voters who asked for assistance, as provided by the statute, and each of the election officials denied ever hearing either Zittello or Caravello make complaint of the fact that candidates in which they were interested, were not receiving enough votes. All of the defendants denied participating in or having knowledge of any wrongdoing at the election. Several witnesses produced by defendants testified that they were assisted in voting, but that two judges, one representing each political party, accompanied them into the booth at the time they voted.

It is suggested that the court was in error in sentencing Dorothy Berger to the penitentiary, and that her conviction for that reason, should be reversed.

In *People v. Gawlick,* 350 Ill. 359, Tillie Gawlick was found guilty and sentenced to the Women's Reformatory on a charge of larceny. On appeal to the Supreme Court, it was insisted that the finding of the jury in that case was erroneous, because there was no evidence adduced upon which any such verdict could be

predicated. In reply to this argument, the Supreme Court said:

"Since the enactment of the statute providing for the State Reformatory for Women, approved June 30, 1927, as amended, (Smith's Stat. 1931, chap. 23, par. 250,) any female person convicted of an offense punishable by imprisonment in the penitentiary is required to be committed to the State Reformatory for Women. The objection of plaintiff in error is without substantial merit."

In *People v. Mikula,* 357 Ill. 481, Stanley Mikula was found guilty of robbery and was sentenced to "the penitentiary of this State at Joliet," and it was claimed that the judgment was erroneous because it failed to designate the specific place of confinement, in accordance with sections 1 and 2 of the Sentence and Parole Act, (Cahill's Ill. Rev. St. 1933, ch. 38, ¶ 795, p. 1089) which provides that the sentence shall be to the "Illinois State Penitentiary." In passing upon this alleged error, the Supreme Court said: "Section 1 of the act relates only to definite sentences for the crimes of treason, murder, rape and kidnaping. Obviously it has no application to this case. Sections 2 and 3 provide for indeterminate sentences (except to jail) for all crimes not enumerated in section 1. Section 2 provides that every such sentence 'shall be a general sentence of imprisonment.' Section 3 requires that persons convicted of felony or other crime punishable by imprisonment in the penitentiary (other than minors of certain ages) shall 'be sentenced to the penitentiary.' Neither section requires the court to fix a specific place of confinement."

The jury saw and heard the witnesses, had before them the ballots and documents referred to, and in view of this fact and the state of the record, we do not feel justified in disturbing the verdict. Therefore, the judgment of the criminal court of Cook county is affirmed.

*Affirmed.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.