THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *v.* LARRY MANNS, Appellant.

(No. 70-117; ■■■■■■■■■■

Fifth District—October 28, 1971.

McGrady, Madden & Watson, of Gillespie, (Denis A. McGrady, of counsel,) for appellant.

R. W. Griffith, Jr., State's Attorney, of Edwardsville, for the People.

Mr. JUSTICE CREBS delivered the opinion of the court, as amended on denial of petition for rehearing.

In a jury trial in the circuit court of Madison County defendant Larry Manns was convicted of theft in that on February 7, 1969 he knowingly exerted unauthorized control over property of another having a value in excess of $150 contrary to section 16—1 of the Criminal Code. He was granted probation for a period of three years conditioned upon paying a fine of $500 plus costs and serving a term of ninety days at the Illinois State Farm at Vandalia.

Defendant has appealed alleging, (1) that he was denied his right to present his defense to the jury; (2) that the cumulative effect of errors of the trial court denied him a fair trial; and (3) that the court erred in refusing defendant the right to exercise a peremptory challenge against a juror already sworn.

The facts presented by the State in proof of the crime may be briefly stated. A law student became suspicious about purchasing an almost new I.B.M. Selectric Model typewriter from defendant for $200, a price which he considered obviously too low. He contacted the Collinsville police and arrangements were made whereby he would allow the defendant to demonstrate the typewriter, obtain the serial number, report it to the police by telephone, and if proven to be stolen, complete the purchase by giving defendant $200 in marked bills. This was done and the police, having been staked out nearby and having watched defendant carrying a typewriter into complainant's house, thereafter arrested him within two blocks after he left and recovered the marked money from his person.

Defendant's defense is much more difficult to state or even ascertain after his brief and argument. In that portion of his brief entitled "Nature

of Action" he states that he "pleaded illegal entrapment and contended that the prosecuting witness was in the employ of a certain named law firm to "fix" or set up the defendant as to a criminal charge for the purpose of discrediting the defendant who was claiming money due him for services to said law firm earned in pursuit of both legal and unethical practices as an investigator". At the trial, following defense counsel's opening statement at the close of the State's case, the trial court asked for a conference in chambers so that he might better understand defendant's defense and thereby be better able to make his rulings. Defense counsel stated that he intended to prove entrapment and that the typewriter in evidence was not the typewriter he delivered to the complaining witness; that at no time had he exercised possession over a stolen typewriter, that he had merely acted as an errand boy delivering a typewriter for a girl friend who had one for sale; that the typewriter in evidence had been switched for the typewriter he delivered as a result of a "frame" by the law firm that was out to plant something on him. When the court reminded counsel that the defense of entrapment was not available to one who denies having committed or participated in an unlawful act, he stated that he had some qualms about that himself and that actually what he was charging was a conspiracy on the part of the law firm and the complaining witness to have defendant charged with a crime. The court explained that its main concern was with defendant's guilt or innocence relative to the typewriter and not with defendant's grievances with the law firm, but on counsel's promise to connect up the latter with the facts of the case on trial he would allow defendant to proceed on his theory.

Defendant then presented a number of witnesses in an attempt to prove the alleged conspiracy. A Private detective testified that he had worked ostensibly as an investigator but actually as a chaser for the law firm in question at the same time defendant had; that he was aware that defendant claimed that the firm owed him money and that defendant had made a number of charges against the firm with the Grievance Committee of the State Bar Association; that various members of the firm, particularly two members of the firm, had asked him to investigate defendant, and find something, anything illegal, immoral or unethical, to discredit his testimony before the Bar Association; that at their direction in the early part of 1968 he contacted two men willing to murder defendant but the firm did not come up with the $1000 down payment; that shortly thereafter he made other arrangements with a man from St. Louis who agreed to put defendant in a wooden box and fill it with cement for a price of $7000, but the deal fell through over a dispute as to who was to kidnap defendant and bring him across the State line to St. Louis; that

the firm, however, did pay $2000 towards the expenses of the two men who had been brought to St. Louis to do the job; that later in May, 1968, members of the firm talked to him about trapping defendant with stolen merchandise in his possession. When questioned specifically about the typewriter case on trial this witness stated that he knew nothing whatsoever about it except what he had read in the newspapers. He stated further that he did not know nor had he ever seen the complaining witness, though he did remember that in May and June, 1968, someone identifying himself by using the same name as the complaining witness had telephoned the reception desk at the law firm on three different occasions and had asked to speak to one of the members of the firm.

A member of the law firm testified that both defendant and the private detective had worked for the firm over a period of time as investigators; that they were paid at an hourly rate, were not chasers and did not share in a percentage of attorney fees. He stated that the firm did owe defendant money, that finally a compromise settlement was agreed upon whereby the firm was to pay defendant $25,000, of which sum $19,365 was paid to defendant on February 7, 1969, the date the agreement was signed. He specifically denied that he knew anything about the typewriter or that he had engaged in any conspiracy to get defendant in trouble by planting a gun or dope on him, or causing him to be charged criminally, nor was he a party to having defendant kidnapped or murdered. He further stated that he did not know the law student until the summer of 1969 when he worked for the firm as a lay researcher during his semester break in law school.

Another member of the firm until July, 1968, in effect repeated this testimony, stating that their financial obligation to defendant had been negotiated out when payment was made on the basis of their agreement. He stated that he never engaged in any conspiracy to murder or kidnap defendant, or plant a gun or dope on him, or set him up or frame him in any way. He stated further that he had no knowledge of the typewriter involved in the cause before the court and did not know the law student.

A woman testified that she had worked as a secretary for the law firm from January, 1966 until September, 1967, and that she recalled taking three different telephone calls in June and July, 1967 from a man identifying himself by the same name as the law student who asked to speak to someone in the firm.

A cashier in a local bank testified that on February 7, 1969, he recalled authorizing a teller to cash two checks for the defendant from the law firm, totaling $19,365 and that afterwards, on request, the defendant had returned $1000 excess cash which the teller had mistakenly paid him due to a miscounting of bills.

An assistant State's Attorney and Chairman of the Bar Grievance Committee, was then offered as a witness but his testimony was disallowed as irrelevant when from the offer of proof it was determined that he would merely testify that late in the afternoon of February 7, 1969, he had witnessed the signature of defendant on his settlement agreement with the law firm.

Ann Meyers Manns, the former girl friend and present wife of defendant, and allegedly the person from whom he obtained the typewriter, was also offered as a witness. When it was determined that she had been present in the court room during most of the trial in violation of the exclusion of witness rule which defendant's counsel had specifically requested, the offer was refused and she was not allowed to testify.

The defense then rested its case without any testimony from the defendant. On motion of the State's Attorney the trial court struck the testimony of all defendant's witnesses on the grounds that it was irrelevant and immaterial. In doing so the court called attention to the fact that on numerous occasions it had expressed its concern over the relevancy of the testimony of defendant's witnesses and that such testimony was admitted only on the repeated assurances of counsel that he would connect it up with the typewriter sold by defendant but rather that it had been switched as a result of a frame-up arranged and carried out by the law firm and the law student. The trial court further expressed its opinion that counsel had totally failed in this regard and that his promises to do so had been a deception on the court. We agree.

■■ In contrast, the State proved that the typewriter in evidence was the property of International Business Machines and was worth in excess of $150; that it was stolen in a burglary from the lessee, Research Laboratories, on December 10, 1968; that defendant sold and delivered this same typewriter to the complaining witness and his wife on February 7, 1969, at which time he called attention to the fact that the typewriter still carried an IBM sticker and warned that it should never be taken back to IBM for repair; that defendant accepted the marked money and was arrested with it on his person within two blocks after leaving complainant's house. In addition the State's proof of chain of possession of the typewriter in evidence was sufficient to identify it with the one sold by defendant and picked up by the police at the house of the complaining witness within a few minutes after the sale. We find such evidence sufficient to support defendant's conviction and prove his guilt beyond a reasonable doubt. Defendant would have us believe that his feud with the law firm with all of its sensational charges constituted an explanation of his recent and exclusive possession of the stolen typewriter. As stated above we find such explanation wholly irrelevant.

■■■ Next, we find no merit in either of defendant's contentions that the trial court erred in refusing to permit him to exercise a peremptory challenge of a juror after he had been sworn, or in refusing to allow defendant's wife to testify after she violated the rule excluding witnesses for most of the trial. It has long been recognized that neither party has the right to peremptorily challenge a juror after he had been accepted and sworn in. (*People v. Curran*, 286 Ill. 302.) And whether to permit one who had remained in court in violation of an order excluding all witnesses is a determination entrusted to the sound discretion of the trial judge. Absent some showing of a clear abuse of that judicial prerogative, the judgment made by the trial court will not be disturbed on review. *People v. Marshall*, 74 Ill.App.2d 472.

■■ After consideration of the entire record and all of defendant's contentions we find that defendant received a fair trial free from reversible error and that the evidence was sufficient to prove him guilty beyond a reasonable doubt. Accordingly, the judgment of the circuit court of Madison County is affirmed.

Judgment affirmed.

MORAN and JONES, JJ., concur.